## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DAWN BERTSCH PORTER,                  :
individually and as Administratrix of :
the Estate of Leland Langston Porter, :
Deceased,                             :
                                      :      CIVIL ACTION NO.
             Plaintiff,               :      1:06-CV-1297-JOF
                                      :
      v.                              :
                                      :
ELI LILLY AND COMPANY,                :
                                      :
             Defendant.               :

## OPINION AND ORDER

This matter is before the court on Defendant's motion to strike expert report of Dr.

Joseph Glenmullen [63]; Defendant's motion for summary judgment [64]; Plaintiff's motion

for leave to file sur-reply [76]; Defendant's motion for leave to file supplemental motion for

summary judgment [81]; and Defendant's motion for summary judgment [82].

I.     **Background**

       A.     **Procedural History and Facts**

       Plaintiff, Dawn Porter, filed suit against Defendant, Eli Lilly & Company, contending

under theories of negligence, negligence per se, breach of warranty, and strict liability, that

Defendant is responsible for the suicide of her husband, Leland "Lee" Porter, because Defendant failed to adequately warn of the risks regarding Prozac and suicide.

Because of the nature of the legal issues raised in Defendant's motion for summary judgment, it is necessary to consider the testimony of Plaintiff's prescribing physician in some detail. Mr. Porter called the office of Dr. Bernard B. Wolfberg, a physician board certified in psychiatry, on July 2, 2003, to seek an appointment. He complained generally of anxiety. Mr. Porter then met in person with Dr. Wolfberg for approximately 40 minutes on July 15, 2003, for an initial consultation. Based on this meeting, Dr. Wolfberg prescribed Prozac to Mr. Porter and advised him to come back for a follow-up visit in four weeks. Mr. Porter committed suicide on July 26, 2003, less than two weeks after beginning to take Prozac.

Dr. Wolfberg testified that he generally engages in a risk-benefit analysis of a drug when prescribing it to a patient. *See* Wolfberg Depo., at 30. This means he informs the patient of why he thinks the medication will be helpful and then explains any side effects that have been reported and the patient chooses whether to take the medication. *Id.* at 31. However, he does not explain every potential serious side effect regardless of frequency because if he did, most patients would choose not to take the medication. *Id.* at 31-32. Dr. Wolfberg testified that based on his experience prescribing Prozac, he felt he was familiar with the drug's risks and benefits. *Id.* at 33.

2

Regarding his understanding of the risks associated with Prozac, he further testified:

Q:     Up through and including today, have you read any literature that discusses whether SSRI's[1] may have a role in worsening depression or the emergence of suicidality in adult populations?

A:     I just said I didn't think that it had.  I don't remember any specific articles about that, to tell you the truth.

. . . .

Q:     Do you recall as you sit here today what the label for Prozac said in July of 2003 about the risk for suicide or suicidalities?

A:     I do not recall.

Q:     When did you first become aware of the concerns about suicidality and SSRI's in any particular patient group?

A:     In the last year or two.

Q:     And I know you don't treat children --

A:     Correct.

Q:     – or adolescents.  So you weren't aware of any of the discussions or any of the literature or any publications that were discussing this issue throughout the nineties or early 2000?

A:     I didn't pay attention, no.

. . . .

Q:     So I guess I'm unclear then because I think it's fair to say that the question of Prozac or SSRI-induced suicidality is not a new one, and it's been in the literature for a little while, in the nineties and two thousands.

         And you didn't read any of that?

A:     Originally, I remember Prozac, there were some lawsuits against Prozac by the Scientologists, and they were dismissed.  And the literature at that time said there was really no connection between suicide and Prozac.  And since then anything that's come up, there's nothing – nothing I've read that I can remember that made me believe that there was an increase in suicide, suicidality with Prozac in adults.

. . . .

---

[1]Selective serotonin reuptake inhibitors (SSRIs) describe a class of antidepressants including Prozac, Paxil, and Zoloft, among others.

3

Q:    Have you ever heard any reference to a small vulnerable subpopulation of people that may be at particular risk for increased suicidality as a result of the use of an SSRI?

A:    Beyond children and adolescents?

Q:    Beyond children.

A:    I don't remember that.

. . . .

Q:    Are you aware of the various public health advisories that have been issued regarding the same topic of SSRI-induced suicide, not only in children, but also in the adult population, that has been issued by the FDA in 2005?

A:    No, I'm not aware of that.

Q:    So, I guess, to be clear on this, in 2003 were you aware of concerns about a link between Prozac and suicidality in adult population?

A:    With OCD [obsessive compulsive disorder]?

Q:    In general.

A:    No, I wasn't.

Q:    What about for major depressive disorder?

A:    I don't know if I was or not.

Q:    Okay.  Fair enough.  Anxiety?

A:    I wasn't aware of that.

*Id.* at 36, 81-82, 83-84, 88.

Regarding his practice of prescribing Prozac, he testified:

Q:    Is there anything about your prescribing practice for Prozac that has changed between July of 2003 and the present?

A:    No.

Q:    Has the information that you provide a patient when you counsel them regarding Prozac at the time you prescribe it, has that information changed since July of 2003?

A:    No.

Q:    Do you believe that if you were to counsel a patient now who you were initiating on 20 milligrams of Prozac daily that your counseling would be similar to the counseling you would have provided Lee Porter back in July of 2003?

A:    Yes, I think so.

4

*Id.* at 36-37.

He further testified:

Q:     Based on the – having read the 2007 PDR [Physicians Desk Reference] version of the Prozac package insert, is there anything in that package insert that makes you believe if you had read that same information in July of 2003, you would have decided to not prescribe Prozac for Lee Porter?

A:     No.  There's nothing there that would have made me not prescribe Prozac for Lee Porter.

. . . .

Q:     Sitting here today, January 12th, 2007, knowing that Lee Porter ultimately took his own life, do you still consider your decision to prescribe Prozac for him on July 15th, 2003, to be an appropriate decision?

A:     Yes.

*Id.* at 72, 75.

Dr. Wolfberg also testified that he carefully considered so-called "black box" warnings on prescription drugs but would still continue to prescribe the drug for patients depending on the nature of the problem.  *Id.* at 38-39.  He would be more concerned about the risk if it occurred in more than one out of a thousand patients.  *Id.* at 39-40.  It would be important to him if the number was one in fifty.  *Id.* at 78-79.  He further stated:

Q:     And, I guess, let me be specific then, in fairness.  If there was a black box warning that said there's been an identified association between some type of medication and suicide or increased suicidal thoughts or suicidality, would you warn your patients about that?

A:     If they had – if that – if that warning was specific to the diagnosis that they had, yes.

5

Q:    And what if it was a generalized type warning, that we've identified this issue with the use of these medications as a class, let's say? Would your answer be the same?

A:    No.

*Id.* at 79-80.

With respect to his specific treatment of Mr. Porter, Dr. Wolfberg testified:

Q:    Doctor, in looking back at your treatment of Lee Porter in July of 2003, sitting here today knowing that he did go on to commit suicide, do you still consider your treatment to have been appropriate?

A:    Yes.

Q:    In looking back at your treatment of Lee and your notes for Lee and knowing that he ultimately committed suicide in late July of 2003, is there anything that you believe you would do now differently than you had done then?

A:    Well, if I forecast – you mean if I – I don't understand the question.

Q:    Sure. I recognize that you couldn't have seen into the future that he committed suicide and that you can't go back and redo anything.

        But I'm just wondering if, based on what you know today in terms of your additional training and experience that you've received since Lee was a patient of yours, if there's anything that you, looking back today, believe you would have done differently than you did back in July of 2003?

A:    Not being – not foretelling the future, no, not – I know he committed suicide now. But at the time, if I didn't know he was going to commit suicide, I would have done the exact same thing. If I knew he was going to commit suicide, I would put him in the hospital that minute.

Q:    Right. But, of course, he didn't ever tell you –

A:    Never told me.

Q:    **He never reported to you that he had any suicidal thoughts.**

A:    **None.**

Q:    **And he never reported to you that he had any suicidal plans.**

A:    **None.**

Q:    **And if he had, you would have taken different action.**

A:    **Correct.**

6

Q:  **On July 15th of 2003, did you consider Lee Porter to be at risk for suicide?**

A:  **No.**

Q:  If there had been a warning back in July of 2003 regarding SSRI's or Prozac and suicide, would you have considered Lee to be at risk for – such that that warning would apply in your risk-benefit analysis for prescribing Prozac for Lee?

A:  Are you saying the warning is for obsessive-compulsive disorder or are you saying that warning is for major depressive disorder?

Q:  Just for the use of the medication in general.

A:  Is there such a warning?

Q:  I'm not asking about a particular warning now.  But if there had been such a warning then, can you – maybe a better way for me to ask you this question is:  Sitting here – well, let me back up.

There's a statement in the prescribing information for Prozac now that says:  There's been a longstanding concern that antidepressants may have a role in inducing worsening of depression and the emergence of suicidality in certain patients.

And first let me just ask you:  Over the years have you read or heard that there may be some concern about antidepressants having a role in inducing the worsening of depression and the emergence of suicidality in certain patients?

A:  In certain patients, I think so.

Q:  **And would that statement, if you had read it back in July of 2003, have caused you to decide not to prescribe Prozac for Lee Porter?**

A:  **No.  It would not have prevented me from prescribing it.**

Q:  **In other words, you had evaluated Lee Porter specifically for suicidality; correct?**

A:  **Correct.**

Q:  **And determined that he wasn't suicidal?**

A:  **Correct.**

Q:  And then you had intended to follow up with him four weeks later; correct?

A:  Correct.

*Id.* at 68-71 (emphasis added).

7

At the time Prozac was prescribed to Mr. Porter in 2003, the package insert for Prozac contained the following warning:

> <u>Suicide</u> – The possibility of a suicide attempt is inherent in depression and may persist until significant remission occurs.  Close supervision of high risk patients should accompany initial drug therapy.  . . .  Because of well-established comorbidity between [obsessive compulsive disorder] and depression . . ., the same precautions observed when treating patients with depression should be observed when treating patients with OCD . . . .

*See* Defendant's Statement of Undisputed Facts, 2003 Physicians' Desk Reference, Exh. C.

Plaintiff's physician expert, Dr. Joseph Glenmullen, stated in his expert report that "[s]ince Lee's death, in recent years, the [Food & Drug Administration] and pharmaceutical industry have warned doctors and the public that antidepressants may make patients suicidal, especially in the period shortly after starting the drugs." *See* Expert Report, at 1.  The Food & Drug Administration warnings recommend that patients who are started on antidepressant therapy should be observed for unusual changes in behavior.  The Food & Drug Administration notes that such side effects could include:  "anxiety, agitation, panic attacks, insomnia, irritability, hostility, akathisia (severe restlessness), hypomania, and mania."  The current Prozac warnings describe these side effects.  Plaintiff further asserts that in December 2006, two scientists employed by Defendant, working with a group from Harvard University, concluded that there is a "small vulnerable subpopulation" of patients who are at risk for Prozac-induced suicidality.

8

**B.**     **Contentions**

Despite that fact that Defendant does not defend the adequacy of the warnings on Prozac in 2003, Defendant contends that under the learned intermediary doctrine applied in Georgia, Plaintiff cannot establish proximate cause in her failure to warn case because she cannot show that had a different warning been given for Prozac, the decedent's prescribing physician would have decided not to prescribe Prozac.  Defendant contends that Georgia would not recognize a presumption that a different warning would have been read and "heeded" so as to relieve Plaintiff of the requirement to prove causation.

Plaintiff responds that the learned intermediary doctrine does not apply to this case because at the time of Mr. Porter's death, Defendant did not provide any warning as to the risk of suicide.  Plaintiff further avers that numerous exceptions to the learned intermediary doctrine preclude its application here.  Moreover, Plaintiff argues that Georgia would apply a presumption that an adequate warning – had it been given – would have been heeded and the court should presume that Mr. Porter's doctor would not have prescribed Prozac. Finally, in response to Defendant's motion for summary judgment, Plaintiff concedes that her breach of warranty claim fails for lack of privity, and the court does not consider it further.

AO 72A
(Rev.8/82)

## II.      Discussion

### A.      Learned Intermediary Doctrine

In the failure to warn subspecies of products liability cases, Georgia applies the Restatement (Second) of Torts § 402A. *See generally Chrysler Corp. v. Batten*, 264 Ga. 723, 724-25 (1994). Prescription drugs, however, traditionally have been treated separately from other products in the failure to warn context. *See Bryant v. Hoffman-La Roche, Inc.*, 262 Ga. App. 401, 412 (2003) (Andrews, P.J., concurring specially) (noting that "[p]rescription drugs have historically been viewed as a category of products that present unique issues" in design defect claim). This separate treatment arises out of comment k to § 402A which states:

> *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. . . . The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

10

Restatement (Second) of Torts, § 402A, cmt. k.  *See also Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 852 (10th Cir. 2003) (applying Wyoming law and explaining that § "402A provides that a seller of a defective, unreasonably dangerous product is strictly liable for physical harm to a consumer.  Comment k to § 402A establishes that this rule does not apply to 'unavoidably unsafe products'").

The "learned intermediary doctrine" is a further exception to the Restatement's general rule in § 402A "that one who markets goods must warn foreseeable ultimate users of dangers inherent in his products." *See Stone v. Smith, Kline & French Labs.*, 731 F.2d 1575, 1579 (11th Cir. 1984) (on certification to the Supreme Court of Alabama) (quoting *Reyes v. Wyeth Labs.*, 498 F.2d 1264, 1276 (5th Cir. 1974)).  Under the learned intermediary doctrine as applied in Georgia, the drug manufacturer is not required to provide warnings to the consumers using the drug, but rather to the doctors who would prescribe the drug. *See*, *e.g.*, *Webb v. Sandoz Chemical Works*, 85 Ga. App. 405 (1952) (although not labeling the learned intermediary doctrine, court held that no liability attached when the drug manufacturer provided a warning in distributing its product).  Later Georgia cases have specifically adopted the learned intermediary doctrine as named.  *See also Bryant v. Hoffman-La Roche, Inc.*, 262 Ga. App. 401 (2003); *Presto v. Sandoz Pharmaceuticals Corp.*, 226 Ga. App. 547 (1997); *Singleton v. Airco, Inc.*, 169 Ga. App. 662, 664 (1984); *Hawkins v. Richardson-Merrell, Inc.*, 147 Ga. App. 481, 482-83 (1978); *Parke, Davis & Co.*

11

*v. Mayes*, 124 Ga. App. 224 (1971) ("Ordinarily, in the case of prescription drugs, a warning as to possible danger in its use to the prescribing physician is sufficient."). The doctrine is well established in state tort law, by some accounting applied in forty-four jurisdictions. *See Thom*, 353 F.3d at 852. *But see State ex rel. Johnson & Johnson Corp. v. Karl*, 647 S.E.2d 899, 220 W. Va. 463 (2007) (Supreme Court of West Virginia noting that doctrine is not applied as widely as believed and holding that learned intermediary doctrine would not be adopted to excuse prescription drug manufacturers from providing warning to consumers in light of direct to consumer advertising, among other factors).

The rationale behind the doctrine has been described that "[a]s a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a 'learned intermediary' between manufacturer and consumer." *Hawkins*, 147 Ga. App. at 483 (quoting *Reyes v. Wyeth Laboratories*, 498 F. 2d 1264, 1276 (5th Cir. 1974)).

12

In one of the more recent discussions of the learned intermediary doctrine, the

Supreme Court of Georgia described it as:

> the manufacturer of a prescription drug or medical device does not have a
> duty to warn the patient of the dangers involved with the product, but instead
> has a duty to warn the patient's doctor, who acts as a learned intermediary
> between the patient and the manufacturer.[2]  The rationale for the doctrine is
> that the treating physician is in a better position to warn the patient than the
> manufacturer, in that the "decision to employ prescription medication [or
> medical devices] involves professional assessment of medical risks in light of
> the physician's knowledge of a patient's particular need and susceptibilities."[3]
> Finally, as [Defendant] concedes, under the learned intermediary doctrine, the
> manufacturer's warnings to the physician must be adequate or reasonable
> under the circumstances of the case.[4]

*McCombs v. Synthes (U.S.A.)*, 277 Ga. 252 (2003) (footnotes in original text).

In reversing the Court of Appeals' decision that the plaintiff had not raised on appeal

the issue of the warning given by the defendant, the Georgia Supreme Court held that

> [i]n light of the principles governing the learned intermediary doctrine, for the
> trial court to grant summary judgment to [Defendant] based on that doctrine,

---

[2]*See Ellis v. C.R. Bard, Inc.*, 311 F.3d 1272, 1279-80 (11th Cir. 2002); *Williams v. American Medical Systems*, 248 Ga. App. 682, 685, 548 S.E.2d 371 (2001); *Presto v. Sandoz Pharmaceuticals Corp.*, 226 Ga. App. 547, 548-49, 487 S.E.2d 70 (1997).

[3]*McCombs*, 250 Ga. App. at 545, 553 S.E.2d 17, quoting *Lance v. American Edwards Laboratories*, 215 Ga. App. 713, 716, 452 S.E.2d 185 (1994).  Accord *Ellis*, 311 F.3d at 1279-81.

[4]*See Ziliak v. AstraZeneca*, 324 F.3d 518, 521 (7th Cir. 2003); Annotation, *Construction and Application of Learned-Intermediary Doctrine*, 57 A.L.R. 5th 1, 29 (1998); Restatement (Third) of Torts: Products Liability, § 6(d)(1); *Ellis*, 311 F.3d at 1278-79 and 1281 (trial court found that warning to physician was adequate and granted summary judgment under learned intermediary doctrine, and the appellate court affirmed).

13

the trial court had to conclude that the warning given by [Defendant] to [Plaintiff's] physician was adequate or reasonable as a matter of law.  Thus, the adequacy of the warning was an issue raised by [Defendant's] motion for summary judgment, and was an issue necessarily resolved adversely to [Plaintiff] by the trial court.  For this reason, [Plaintiff] was entitled to argue this issue on appeal, and the Court of Appeals erred in holding to the contrary.

*Id.* at 253.

## B.    Who Should Be Warned

Plaintiff argues that Defendant should be required to warn those individuals who use Prozac, as well as the physicians who prescribe it.  As Plaintiff recognizes, this would be an expansion of Georgia law, and there is no indication in the case law that Georgia is inclined to move to this requirement.  As described above, as recently as 2003, the Supreme Court of Georgia affirmed the state's adherence to the learned intermediary doctrine which requires that only physicians be warned in the case of prescription drugs.

Plaintiff also argues that the consumer must be provided warnings with respect to Prozac because Georgia courts would apply an "all-inclusive" exception to the learned intermediary doctrine set forth in the Restatement (Third) of Torts, § 6(d)(2), that requires a warning be given to the patient "when the manufacturer knows or has reason to know that health-care providers will not be in a position to reduce the risks of harm in accordance with the instructions or warnings."  *Id.*  No Georgia court has specifically adopted § 6(d)(2) of the Restatement (Third), although as discussed above, the Georgia Supreme Court did cite to § 6(d)(1) in *McCombs v. Synthes (U.S.A.)*, 277 Ga. 252, 253 n.4 (2003).  That citation,

14

however, was in the context of whether the warning to the physician was adequate. Furthermore, comment e to Section 6 of the Restatement (Third) of Torts explains the purpose of § 6(d)(2) which

> recognizes that direct warnings and instructions to patients are warranted for drugs that are dispensed or administered to patients without the personal intervention or evaluation of a health-care provider.  An example is the administration of a vaccine in clinics where mass inoculations are performed. In many such programs, health-care providers are not in a position to evaluate the risks attendant upon use of the drug or device or to relate them to patients. When a manufacturer supplies prescription drugs for distribution to patients in this type of unsupervised environment, if a direct warning to patients is feasible and can be effective, the law requires measures to that effect.
>
> Although the learned intermediary rule is generally accepted and a drug manufacturer fulfills its legal obligation to warn by providing adequate warnings to the health-care provider, arguments have been advanced that in two other areas courts should consider imposing tort liability on drug manufacturers that fail to provide direct warnings to consumers.  In the first, governmental regulatory agencies have mandated that patients be informed of risks attendant to the use of a drug.  A noted example is the FDA requirement that birth control pills be sold to patients accompanied by a patient package insert.  In the second, manufacturers have advertised a prescription drug and its indicated use in the mass media.  Governmental regulations require that, when drugs are so advertised, they must be accompanied by appropriate information concerning risk so as to provide balanced advertising.  The question in both instances is whether adequate warnings to the appropriate health-care provider should insulate the manufacturer from tort liability. . . . **The Institute leaves to developing case law whether exceptions to the learned intermediary rule in these or other situations should be recognized.**

Restatement (Third) of Torts, § 6, cmt. e (emphasis added).

15

Clearly, the initial portion of comment e is inapplicable to the instant case where Mr. Porter met individually with Dr. Wolfberg who considered Mr. Porter's history and then decided to prescribe Prozac.  Further, the fact that the Restatement (Third) reports that "arguments have been advanced" is a clear signal that such arguments have not been adopted by any jurisdiction in any sufficient number, let alone in Georgia.  Moreover, Plaintiff concedes that at the time of Mr. Porter's death, the Food & Drug Administration did not mandate that consumers be warned of any suicide risks associated with the use of Prozac.  Finally, although Plaintiff asks the court to take judicial notice of Lilly's website www.prozac.com as evidence that Prozac has been extensively advertised in the media and therefore § 6(d)(2) would require a consumer warning, the court notes again that this would be an expansion of the current state of law as it exists in Georgia which affirmatively recognizes the learned intermediary doctrine.  The Supreme Court of Georgia's citation to § 6(d)(1) – which is unrelated to the direct notification to consumers issue – is not a sufficient basis upon which this court could conclude that Georgia would now adopt the suggestions of the Restatement (Third), reject the learned intermediary doctrine, and require direct warnings to consumers.[5]

---

[5]The court GRANTS Plaintiff's motion for leave to file sur-reply [76-1].

In sum, the court finds there is no indication that courts in Georgia are moving toward a general requirement of direct warning to consumers of prescription drugs, and the court declines to adopt any such obligation here.

### C.        Intersection of the Learned Intermediary Doctrine with Proximate Cause

For the purposes of its summary judgment motion, Defendant assumes arguendo that the warning on Prozac in 2003 was not sufficient.  Plaintiff argues that this admission bars the use of the learned intermediary doctrine because as a threshold matter, a defendant must show that adequate warning was given before obtaining the benefit of the learned intermediary doctrine.  There is some force to this argument in the wording of Georgia case law, but Georgia courts have never directly discussed the impact of an arguably inadequate warning on the element of causation.[6]

As a general matter, of course, Georgia courts have addressed the issue of proximate cause in relation to products liability cases.  "To establish a claim for failure to warn, the plaintiff must show the defendant had a duty to warn, that defendant breached that duty and the breach was the proximate cause of the plaintiff's injury."  *Wheat v. Sofamor, S.N.C.*, 46 F. Supp. 2d 1351, 1363 (N.D. Ga. 1999) (Story, J.) (*citing Powell Duffryn Terminals, Inc.*

---

[6]The court does note that a federal court has predicted Georgia's reach on this subject. *See Wheat*, 46 F. Supp. 2d at 1363-64 ("Where a learned intermediary has actual knowledge of the substance of the alleged warning and would have taken the same course of action even with the information the plaintiff contends should have been provided, courts typically conclude that the learned intermediary doctrine applies or that the causal link is broken and the plaintiff cannot recover.").

17

*v. Calgon Carbon Corp.*, 4 F. Supp. 2d 1198 (S.D. Ga. 1998) (Nangle, J.), *aff'd*, 176 F.3d 494 (11th Cir. 1999)); *see also Powell v. Harsco Corp.*, 209 Ga. App. 348 (1993)). "As a general rule, issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases." *Ogletree v. Navistar Int'l Transp. Corp.*, 245 Ga. App. 1, 3-4 (2000). "To recover damages in a tort action, a plaintiff must prove that the defendant's negligence was both the 'cause in fact' and the 'proximate cause' of [the] injury." *Id.* Proximate cause is a necessary element of the plaintiff's case whether "proceeding under a strict liability or a negligence theory." *Powell*, 209 Ga. App. at 350. Proximate cause is "but for" causation in that the "defendant's conduct is not a cause of the event, if the event would have occurred without it." *See General Motors Corp. v. Davis*, 141 Ga. App. 495, 495-96 (1977) (quoting W. Prosser, Law of Torts (4th ed. 1971)).

Other courts that have determined that the adequacy of the warning must be submitted to the jury have then gone on to consider whether the plaintiff can establish the causation element of her tort cause of action. *See*, *e.g*, *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848 (10th Cir. 2003) (applying Wyoming law and holding issue of material fact existed as to whether the package insert accurately warned of side effects of medication before proceeding to discuss proximate cause); *Laisure-Radke v. Par Pharmaceutical, Inc.*, 426 F. Supp. 2d 1163 (W.D. Wash. 2006) (applying Washington law and considering

learned intermediary doctrine after concluding that adequacy of warning was question for jury).  A Georgia court, however, has not specifically addressed the situation in the instant matter; that is, the defendant drug company assumes for the purposes of summary judgment that the warning was not adequate, the prescribing doctor has testified that he had no actual knowledge of potential suicide risk with Prozac, yet the prescribing doctor unequivocally testified that even had he known of the suggested warning, he still would have prescribed Prozac because he did not view the patient as a suicide risk.

At this point in the litigation, most courts turn to the notion of presumptions keying off of the language in comment j to § 402A of the Restatement which provides that "[w]here warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor it is unreasonably dangerous."  *Id.*

Plaintiff argues that Georgia would apply the "heeding presumption" of comment j, pointing to *Zeigler v. CloWhite Co.*, 234 Ga. App. 627 (1998), and *Chrysler Corp. v. Batten*, 264 Ga. 723 (1994).  In both *Batten* and *Zeigler*, however, the court considered a failure to warn case brought against a bleach and automobile manufacturer, respectively, and cited comment j for the proposition that "seller is required to give warning if 'he has knowledge, or by the application of reasonable, developed human skill and foresight should have

19

knowledge' of the danger"). 234 Ga. App. at 629. Neither of these cases sheds any light on whether Georgia would apply a "heeding presumption" in a prescription drug case.

In the end, what is particularly relevant to this case is not whether Georgia would apply the presumption of § 402A, but **how** Georgia would apply that presumption. Courts approach this presumption in one of two ways, labeling it either a "heeding presumption" or a "rebuttable presumption." As the names would suggest, under the theory of a "heeding presumption," a court "presumes that warnings, if given, will be heeded and followed and that medical practitioners will act competently." *See, e.g.*, *Mahr v. G. D. Searle & Co.*, 390 N.E.2d 1214, 1233, 72 Ill. App. 3d 540 (Ill. App. Ct. 1st Dist. 1979). These courts have interpreted this "heeding presumption" to equate to a presumption of causation. For example, in *Hamilton v. Hardy*, the court stated that "[w]hat the doctor might or might not have done had he been adequately warned is not an element plaintiff must prove as part of her case." 37 Colo. App. 375, 549 P.2d 1099, 1109, *overruled on other grounds*, *State Board of Medical Examiners v. McCroskey*, 880 P.2d 1188 (Colo. 1994); *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Ka. 387, 681 P.2d 1038, 1057-58 (D. Kan. 1984).

Other courts have concluded that to make such a presumption of causation improperly relieves the plaintiff of a burden of proving the causation element of her cause of action. Those courts have applied a burden-shifting framework described as:

> (1) the plaintiff carries the initial burden of producing sufficient evidence that the defendant manufacturer failed to warn of a non-obvious risk about which

20

the manufacturer knew or should have known; (2) assuming the plaintiff raises a triable issue on this question, a rebuttable presumption arises that the physician would have heeded an adequate warning had such a warning been provided; (3) defendant must then come forward with sufficient evidence to rebut that presumption; and (4) if the presumption is rebutted, plaintiff must produce sufficient evidence to create a triable issue on the question of causation.

*See*, *e.g.*, *Tobin v. SmithKline Beecham Pharmaceuticals*, Civil Action No. 00-CV-0025, order dated April 12, 2001, at 16 (citing *Garside v. Osco Drug*, 976 F.2d 77, 81 (1st Cir. 1992), and *Knowlton v. Deseret Medical, Inc.*, 930 F.2d 116, 123 (1st Cir. 1991)).  *See also Plummer v. Lederle Lab.*, 819 F.2d 349, 358-59 (2d Cir. 1987); *Miller v. Pfizer, Inc. (Roerig Division)*, 196 F. Supp. 2d 1095 (D. Kan. 2002) (in suit for suicide of teenager prescribed Zoloft, court applied rebuttable presumption); *Grenier v. Medical Engineering Corp.*, 99 F. Supp. 2d 759, 766 (W.D. La. 2000) (in silicone breast implant litigation, finding that defendant did not provide any warning about silicone "gel bleed" but under learned intermediary doctrine, plaintiff failed to show doctor would have altered treatment had warning been given); *Woulfe v. Eli Lilly & Co.*, 965 F. Supp. 1478, 1483 (E.D. Okla. 1997) (applying Oklahoma law) (in summary judgment context, court assumed warnings were inadequate and applied "rebuttable presumption in favor of Plaintiff that an adequate warning would have been read and heeded"); *Seley v. G. D. Searle & Co.*, 67 Ohio St. 2d 192, 423 N.E.2d 831, 839 (Ohio 1981) ("Where, as here, an adequate warning would have made no difference in the physician's decision as to whether to prescribe a drug or as to

21

whether to monitor the patient thereafter, the presumption established by Comment j is rebutted, and the required element of proximate cause between the warning and ingestion of the drug is lacking."). Thus, any presumption in favor of the following of a warning not given is rebuttable by evidence that the physician would not have altered his treatment even had he known of the warning.

A recent opinion from the Court of Appeals for the Tenth Circuit held that the "vast majority of jurisdictions hold that where a warning is inadequate, the plaintiff is entitled to a rebuttable presumption that an adequate warning would have been heeded if one had been given." *See Thom*, 353 F.3d at 855 (citing *Garside v. Osco Drug, Inc.*, 976 F.2d 77, 81 (1st Cir. 1992); *Snawder v. Cohen*, 749 F. Supp. 1473, 1479 (W.D. Ky. 1990)).

For the purposes of adjudicating Defendant's motion for summary judgment, the court assumes that Georgia will apply the presumption in comment j to § 402A. The court finds that there is no indication in Georgia law, however, that it would apply this comment in the manner of a "heeding presumption" that would vitiate the need for a plaintiff to establish proximate cause for her injuries. As such, the court will apply to the instant case the burden-shifting "rebuttable presumption" followed by the majority of jurisdictions.

Under that presumption, the court finds based on Defendant's concession for the purposes of its summary judgment motion that whatever warnings were given for Prozac in 2003 were not adequate. However, Defendant has rebutted this presumption via the strength

of Dr. Wolfberg's testimony that he would not have treated Mr. Porter with a different medication or in a different manner had he known of the risk of suicide to a small subpopulation of consumers (proffered by Plaintiff's expert) and which is apparently recognized by the more recent warnings. Dr. Wolfberg testified that even had he known of an issue with a subpopulation, he would not have altered treatment for Mr. Porter because he did not identify Mr. Porter as a suicidal risk in his initial intake meeting.

Plaintiff has proffered no evidence to show that Dr. Wolfberg's testimony is not sufficient to rebut the presumption. *See also Eck v. Parke, David & Co.*, 256 F.3d 1013, 1018-19 (10th Cir. 2001) (applying Oklahoma law) (to get to jury, plaintiff must either discredit or call into question treating physician's testimony or show in another manner that the failure to warn was the proximate cause of injury).

Plaintiff does argue that Defendant cannot break the causation chain because there is some question as to whether Dr. Wolfberg would have prescribed Prozac to Mr. Porter had there been a warning. Plaintiff points to the portion of Dr. Wolfberg's deposition where he testifies that he pays attention to black box warnings and a frequency of risk greater than one in one thousand gives him pause and causes him to discuss risks with his patients. *See* Wolfberg Depo., at 40, 78-80, and 100. However, as described above, Dr. Wolfberg's testimony related to warnings generally. In the only testimony specific to suicide risks, Dr. Wolfberg stated that he would only discuss those risks if he had determined the patient was

23

a suicide risk, which he had not with respect to Mr. Porter. *See id.* at 80 (noting that he would discuss warning "if that warning was specific to the diagnosis that [the patient] had").

Plaintiff points to an advisory of the Food & Drug Administration issued in May 2005 which indicated that "increases in suicidal thinking could be expected in 1 out of 50 pediatric patients treated with Prozac." *See* Response, at 23. Notably, however, even assuming Plaintiff's proffers, this risk advisory would apply only to pediatric patients. Further, Dr. Wolfberg never considered Mr. Porter to have had suicidal thoughts, so even were this advisory to extend to adult patients, it would not have impacted Dr. Wolfberg's thinking because it refers to "increases" in suicidal thinking.

Plaintiff further contends that Dr. Wolfberg was aware of the "significance" of a family member's suicide in terms of a potential risk factor for suicidality of his patient and that Mr. Porter's father had committed suicide. *See* Wolfberg Depo., at 48-50, 95-97. While recognizing that there may be some significance to the suicide of Mr. Porter's father, Dr. Wolfberg still did not classify Mr. Porter as a suicide risk based on his initial meeting with him. Thus, no matter what might have been presented as a warning with Prozac in terms of increased suicide risk, this would not have impacted Dr. Wolfberg's decision-making because he did not view Mr. Porter as a suicide risk. There is no evidence in Dr. Wolfberg's deposition testimony that a different warning on Prozac would have impacted Dr. Wolfberg's decision to prescribe Prozac. In fact, quite the opposite is true.

24

The court further finds there is no evidence in the record here that Dr. Wolfberg's testimony is "self-serving" or otherwise non-objective.  Dr. Wolberg's determination that Mr. Porter was not a suicide risk is unrebutted.  Dr. Wolfberg has no connections to Defendant through studies or clinic trials.

It is because Dr. Wolfberg's testimony on this point is unambiguous that the other cases cited by Plaintiff are inapplicable.  *See*, *e.g.*, *Giles v. Wyeth, Inc.*, 500 F. Supp. 2d 1063 (S.D. Ill. 2007) (declining to resolve whether "heeding presumption" alleviated plaintiff of obligation to prove causation because prescribing physician's testimony raised question of fact as to whether he would have prescribed drug had he been given different warning); *Tobin v. SmithKline Beecham Pharmaceuticals*, Civil Action No. 00-CV-0025, order dated April 12, 2001 (declining to find defendant had rebutted presumption where physician's testimony created question of fact as to whether he would have prescribed Paxil had he been given different warning).

For this reason, the court finds that Plaintiff cannot establish proximate cause for her causes of action of negligence, negligence per se, and strict liability.  *See Powell v. Harsco Corp.*, 209 Ga. App. 348, 350 (1993) ("Whether proceeding under a strict liability or negligence theory, 'proximate cause' is a necessary element of [the plaintiff's] case."). Therefore, the court GRANTS Defendant's motion for summary judgment [64-1].  Because the court grants Defendant's motion for summary judgment, the court DENIES AS MOOT

Defendant's motion to strike expert report of Dr. Joseph Glenmullen [63-1]; DENIES AS MOOT Defendant's motion for leave to file supplemental motion for summary judgment [81-1]; and DENIES AS MOOT Defendant's motion for summary judgment [82-1]..

## III.    Conclusion

The court DENIES AS MOOT Defendant's motion to strike expert report of Dr. Joseph Glenmullen [63]; GRANTS Defendant's motion for summary judgment [64]; GRANTS Plaintiff's motion for leave to file sur-reply [76]; DENIES AS MOOT Defendant's motion for leave to file supplemental motion for summary judgment [81]; and DENIES AS MOOT Defendant's motion for summary judgment [82].

**IT IS SO ORDERED** this 25th day of February 2008.

                      s/ J. Owen Forrester
                     J. OWEN FORRESTER
                SENIOR UNITED STATES DISTRICT JUDGE

26